IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2015

STATE OF TENNESSEE v. CHRISTOPHER M. EPPS

Appeal from the Criminal Court for Davidson County
No. 2012-B-1179     Mark J. Fishburn, Judge

_____

No. M2014-01955-CCA-R3-CD – Filed October 14, 2015

_____

Following a jury trial, Christopher M. Epps ("the Defendant") was convicted of first degree felony murder and sentenced to life.  On appeal, the Defendant contends that the evidence is insufficient to support his conviction and that the trial court erred when it denied his request for a special jury instruction on eyewitness identification.  Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Christopher M. Epps.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Dina Shabayek and Rob McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

OPINION

## I.  Factual and Procedural Background

In May 2012, the Davidson County Grand Jury indicted the Defendant for first degree premeditated murder, first degree felony murder, and employing a firearm during the commission of a dangerous felony, all in connection with the death of the victim, Dustyn Taapken.  At the Defendant's subsequent trial, Steven Simpson testified that he

had been the victim's best friend before the victim's murder in May 2011. Mr. Simpson explained that, at the time of his death, the victim lived on Barella Court in Antioch and regularly sold marijuana to support himself. Mr. Simpson recalled that, on the evening of May 21, 2011, he went to the victim's residence to "hang out" and play video games. Although Mr. Simpson admitted using marijuana at times, he stated that he had not been smoking marijuana that night. Mr. Simpson recalled that, around 11:00 p.m., Joseph Snorten and two other men came to the victim's residence. Mr. Simpson did not find it unusual for the victim to have visitors that late because the victim "was selling drugs, plus he had a lot of friends[.]" As they came into the victim's residence, Mr. Snorten introduced the two men, later identified as the Defendant and Mr. Varquez Sails.[1] Mr. Simpson sat on a sectional sofa, along with the victim and the Defendant. Mr. Snorten sat on a love seat with Mr. Sails. The group talked about drugs for a while, and the two men showed the victim and Mr. Simpson a large bag of marijuana they had in their possession. Mr. Simpson recalled that one of the men had a small, red and black backpack.

As the group talked, Mr. Sails asked to use the restroom. Mr. Sails was in the restroom for only a short time and then returned to the living room, holding a gun. The Defendant also pulled out a gun and began demanding money. The Defendant said, "[D]on't do anything stupid, we'll shoot," and Mr. Sails told Mr. Simpson and the victim that "they weren't playing." As they brandished the weapons, the Defendant and Mr. Sails made the victim and Mr. Simpson get off the couch and lay face down on the floor. The Defendant and Mr. Sails took cash from the victim and Mr. Simpson and then asked if anyone else was in the home. When the victim indicated that someone was in the back bedroom, Mr. Sails went down the hallway to the bedroom and brought out the victim's roommate, Nicholas Watson. The Defendant, who was still in the living room telling Mr. Simpson and the victim not to move, directed Mr. Sails to "bring him out." Mr. Simpson testified that, as Mr. Sails led Mr. Watson into the hallway, Mr. Simpson heard gunshots. He looked toward the victim and saw that the victim had been shot. The Defendant was standing over the victim with a gun. Mr. Simpson stated that he was about two to three feet away from the Defendant and he looked at the Defendant's face while the Defendant was looking at the victim. Mr. Sails ran into the living room and told the Defendant, "Hey, we got to go, we got to go." After they left, Mr. Simpson immediately called 911 and began performing CPR on the victim until help arrived. He recalled that Mr. Snorten sat on the love seat during the robbery but fled the scene with the Defendant and Mr. Sails after the shooting. Mr. Simpson testified that he never saw Mr. Snorten with a gun.

---

[1] Mr. Sails was indicted along with the Defendant for his role in the offense.

Mr. Simpson spoke to police officers at the scene and provided descriptions of the Defendant, Mr. Sails, and Mr. Snorten. Mr. Simpson testified that, once he knew the two men had guns, he became "more intent looking at the faces" because he thought he would be able to "know . . . their intentions." Mr. Simpson described the Defendant as a black male in his early twenties, about six feet tall and heavyset. He estimated the Defendant weighed about 300 or 350 pounds and said that he had "[l]oose, curly hair." Mr. Simpson told the police that Mr. Snorten's name was "Joe" and that he went to school at Nashville Auto Diesel College ("NADC"). The following day, detectives showed Mr. Simpson a photo lineup from which he identified the Defendant as the shooter. He was also able to identify Mr. Snorten and Mr. Sails from additional photo lineups. Mr. Simpson identified the Defendant at trial as the individual that shot the victim.

On cross-examination, Mr. Simpson acknowledged that he did not tell investigators that the Defendant had dreadlocks. Mr. Simpson explained, "[I]t wasn't a real tight dreadlock. They were single strands, you know, like dreadlocks, but it wasn't just real tight, pulled together, seemed like." Mr. Simpson testified that he did not pick anyone out of the first photo lineup because none of the men in the lineup looked like the suspects. Mr. Simpson stated, "[I]t was important to me to make sure a hundred percent that if I did pick anyone that it was going to be the correct person." He stated that he was "[p]ositive 100 percent" that the Defendant was the man that shot the victim.

Joseph Snorten testified that, in May 2011, the victim was his friend and marijuana supplier. Mr. Snorten explained that he would purchase marijuana from the victim and then resell it. Because he had both a business and social relationship with the victim, Mr. Snorten had been to the victim's home on multiple occasions before the night of the offense. Mr. Snorten acknowledged that he had been arrested in connection with the victim's murder and had retained an attorney to represent him. He explained that, while he hoped to get a benefit from his testimony, he had no agreement with the State to that effect.

Mr. Snorten stated that he met Mr. Sails, whose nickname was "Quez," while he was locked up on another charge. Mr. Snorten knew the Defendant, whose nickname was "Goldie," through the Defendant's brother. On the evening of May 21, 2011, Mr. Sails contacted Mr. Snorten, seeking to purchase marijuana. Mr. Snorten did not have any marijuana, so he intended to obtain some from the victim. Mr. Snorten met Mr. Sails and the Defendant and drove the two men to the victim's home. Mr. Snorten recalled that Mr. Sails suggested they rob the victim and the Defendant agreed to participate in the robbery. Although Mr. Snorten had a feeling "something wasn't going to go right," he went along with the idea. Mr. Snorten explained that he, the Defendant, and Mr. Sails were armed with guns when they went to the victim's house. When they arrived, Mr. Snorten initially "tried to abort the mission," but the Defendant said that he "didn't come

out here for nothing." Mr. Snorten testified that he was afraid the Defendant and Mr. Sails might rob him if he backed out of the robbery of the victim.

According to Mr. Snorten, the men sat down in the living room once inside the victim's residence, and the victim brought out some marijuana. About this time, the Defendant asked the victim if he could use the restroom. The Defendant came out of the restroom with a gun and said, "[D]on't nobody move." Mr. Sails also pulled out a gun, and the Defendant directed the victim and Mr. Simpson to get down into the floor. Mr. Sails then told Mr. Snorten to go to the back of the house to make sure no one else was there. While in the back bedroom, Mr. Snorten heard the Defendant say several times from the living room "don't move," and then he heard a gunshot. Mr. Snorten, Mr. Sails, and the Defendant ran out of the house, and Mr. Snorten drove the men away from the scene. Inside the car, the Defendant said, "hey, man, my bad" and that he "didn't mean for it to go down like that."

Mr. Snorten testified that he contacted an attorney and turned himself in the following day after learning that the police were looking for him. On cross-examination, Mr. Snorten stated that he initially told the police he did not have a gun and denied knowing the robbery was going to take place. He also lied to investigators about knowing Mr. Sails' identity because he and Mr. Sails were members of the Gangster Disciples and he did not want to be labeled a "snitch." However, when shown a photo lineup containing Mr. Sails, Mr. Snorten identified him as one of the assailants. Mr. Snorten also identified the Defendant in a photo lineup and told the police that the Defendant was the shooter. Mr. Snorten stated that the Defendant had been a member of the Gangster Disciples at one time but had switched gangs to join the Crips. He denied ever hearing that the Defendant was a snitch. Mr. Snorten stated that the Defendant had dreadlocks in May 2011.

Nicholas Watson testified that he was currently serving a fourteen-year sentence for attempted murder in connection with an unrelated offense. Mr. Watson stated that he was living with the victim on May 21, 2011, and was asleep in the back bedroom when he heard "loud talking." Mr. Watson heard someone say, "Where's the money at? You better tell me where the money is at or I'm gonna bust your [a**][.]" He then heard someone say, "[W]ho else is in the house, I'm gonna search the house." Mr. Watson recalled that a "dark-skinned" man with dreadlocks came into his room and forced him out of the bed and into the floor at gunpoint. The assailant then called for Mr. Snorten who came into the bedroom and held Mr. Watson at gunpoint. When the man with dreadlocks left the room, Mr. Watson heard gunshots, and Mr. Snorten ran out of the room. When Mr. Watson went into the living room, he saw Mr. Simpson performing CPR on the victim. Mr. Watson confirmed that he never left the bedroom until the incident was over and he never saw the third suspect. He explained that, at the time of

the murder, he had an outstanding warrant for his arrest and had been hiding out at the victim's residence.

Detective Daniel Polk with the Metro Nashville Police Department ("MNPD") responded to the call from the victim's residence on the night of May 21, 2011. Detective Polk testified that, when he arrived, there was a white male on the front porch directing him into the house. The victim, who appeared to have a gunshot wound to the chest, was lying on his back in the floor of the living room, and Mr. Simpson was performing CPR. Mr. Simpson gave Detective Polk a very brief, general description of the suspects, stating there was a "big fat black guy and a tall skinny black guy." Detective Polk recalled that there was an overwhelming smell of marijuana coming from the victim's house.

Sharon Tilley, a crime scene technician with MNPD, testified that she and another technician responded to the victim's residence. They photographed and sketched the scene and collected two shell casings. Ms. Tilley stated that she did not collect any weapons and did not know if a weapon was ever tested against the collected shell casings. She was not aware of any physical evidence from the scene that implicated the Defendant.

Dr. Feng Li, the senior associate medical examiner for Davidson County, testified that he conducted the victim's autopsy. Dr. Li stated that the victim had received a perforating gunshot wound to his back, causing injury the victim's left lung, heart, and stomach. Dr. Li determined that the gunshot had been an "intermediate range" shot, meaning that the assailant had been shot the victim from two and a half to three feet away.

Detective Corey Wall with MNPD testified that, when he responded to the crime scene about half an hour after the 911 call, he could smell the odor of marijuana inside the residence. However, when he later interviewed Mr. Simpson at the police department, Mr. Simpson denied smoking marijuana that night. Mr. Simpson described the shooter as a black male, 350 pounds, with "[l]oose, curly" hair. Mr. Simpson identified Mr. Snorten by his first name, "Joe," and told Detective Wall that Mr. Snorten attended NADC. Based upon this information, Detective Wall placed Mr. Snorten in a photo lineup the day after the murder, and Mr. Simpson positively identified him.

Detective Wall interviewed Mr. Snorten after his arrest on May 25, 2011. Mr. Snorten informed Detective Wall that "Quez" and "Goldie" were involved in the robbery and murder but claimed that he did not know their real names. Mr. Snorten later identified the Defendant in a photo lineup. Detective Wall explained that he instructed

both Mr. Snorten and Mr. Simpson to make an identification only if they were one hundred percent sure.

Detective Wall recalled that the police received several anonymous tips on potential suspects through Crimestoppers in relation to the case. One tip led Detective Wall to a man named Victor Sherrell-Scruggs. Detective Wall obtained cell phone records for Mr. Sherrell-Scruggs and Mr. Snorten and found that Mr. Sherrell-Scruggs' phone number appeared on Mr. Snorten's cell phone records twice on the day of the murder. Detective Wall also received information from another source that someone with the nickname "Goldie" was involved in the murder. Once he determined that the Defendant's nickname was Goldie, Detective Wall prepared a photo lineup for Mr. Watson and Mr. Simpson with the Defendant's photograph. Mr. Watson could not make an identification, but Mr. Simpson identified the Defendant. Detective Wall explained that he did not initially charge the Defendant because he had only one identification and needed follow-up on the tip on Mr. Sherrell-Scruggs. Detective Wall interviewed Mr. Sherrell-Scruggs and placed him into a photo lineup. Mr. Sherrell-Scruggs was eliminated as a suspect after witnesses failed to identify him. Detective Wall testified that he received another tip at the end of June 2011, which provided the Defendant's name. The Defendant turned himself in on July 7, 2011.

Williams Skeeters testified that, in May 2011, he ran an after-hours bar on Lea Avenue. Mr. Sherrell-Scruggs occasionally worked for Mr. Skeeters as a bouncer. Mr. Skeeters recalled that Mr. Sherrell-Scruggs worked on May 22, 2011, and would have been at the bar at the time it opened. Mr. Skeeters believed that the bar opened at 2:00 a.m. on May 22, but he was "[n]ot a hundred percent" sure. In any event, Mr. Sherrell-Scruggs did not appear nervous or exhibit unusual behavior while at work. After hearing about the victim's murder, Mr. Skeeters called Crimestoppers and left information that Mr. Sherrell-Scruggs and another bouncer at the bar matched the description of one of the suspects.

Dr. Jeffrey Neuschatz testified for the Defendant as an expert in eyewitness identification. Dr. Neuschatz described several factors that could affect an individual's ability to accurately remember a situation and identify a suspect. He first explained that high-stress situations impaired memory. Dr. Neuschatz cited studies that showed when individuals were afraid for their lives or safety, facial recognition identification was "significantly worse." Dr. Neuschatz clarified that it was more difficult to make an accurate identification after a stressful situation but not impossible. Dr. Neuschatz next discussed "weapon focus" and explained that eyewitnesses tended to look at a weapon rather than other aspects of an event when a weapon was present, which lessened identification accuracy. Dr. Neuschatz also stated that research showed people were worse at identifying someone of another race. He further explained that the use of

alcohol and marijuana impaired the encoding process of memory, making it more difficult to make an accurate identification. Given the facts of this case, Dr. Neuschatz opined that is was possible Mr. Simpson's memory of the incident was mistaken. On cross-examination, Dr. Neuschatz agreed that, if an individual had the ability to observe a person for a period of several minutes prior to a weapon being brandished, it would improve the potential for accuracy in identification.

The Defendant testified that, in the spring of 2011, he lived with his grandmother in East Nashville. He did not have a job, but his grandmother provided him with money. The Defendant acknowledged that he had joined the Gangster Disciples when he was fourteen years old and remained a member of the gang until 2008. He explained that both Mr. Sails and Mr. Snorten were also Gangster Disciples members. According to the Defendant, when he was about sixteen, he witnessed a murder and was subpoenaed to court to testify. Although the case ended up settling, the Defendant had been labeled a snitch, and he broke ties with the Gangster Disciples and associated himself with the 98 Mafia Crips. The Defendant stated that he and Mr. Sails were together on a regular basis in May 2011 and they spent most of their time at Mr. Sails' house. On the other hand, Mr. Snorten gave the Defendant the cold shoulder, refusing on one occasion to give the Defendant a ride to a store. The Defendant testified that in May 2011, he wore his hair in dreadlocks. He stated that his hair would not have been "fuzzy" at that time of the offense because his grandmother had given him money to have his hair done for his birthday earlier that month.

The Defendant stated that, on the day of the victim's murder, he did not go to Mr. Sails' house. Instead, he was picked up at his grandmother's house around 8:00 p.m. by Jamaal Saunders, the brother of the Defendant's ex-girlfriend. The Defendant explained that Mr. Saunders had been a member of the 98 Crips but had been shot and killed sometime after the victim's murder. According to the Defendant, Mr. Saunders took him to meet with Mr. Sails and Mr. Snorten so that Mr. Saunders could sell the two men some marijuana. The Defendant recalled that the inside of Mr. Saunders' car smelled strongly of marijuana, and Mr. Saunders showed the Defendant a quarter-pound of marijuana inside a small red and black backpack. The Defendant stated that he and Mr. Saunders met with Mr. Sails and Mr. Snorten at Panorama Apartments in East Nashville. Mr. Sails and Mr. Snorten were together in a small blue car. While the Defendant spoke to Mr. Sails, Mr. Saunders and Mr. Snorten walked off together. When they returned, Mr. Snorten had the backpack with the marijuana.

The Defendant denied that he planned to rob the victim with Mr. Sails and Mr. Snorten and testified that he did not see the two men for the remainder of the evening. The Defendant recalled that he and Mr. Saunders later stopped at the house of another member of the 98 Crips, Charles Transley, who was also no longer alive. The Defendant

and Mr. Saunders then went to another apartment complex and stayed with Mr. Saunders' girlfriend for the rest of the night. The Defendant denied killing the victim and stated that he was not with Mr. Sails and Mr. Snorten at the time of the robbery and murder.

At the close of proof, the Defendant requested a modification of the pattern jury instruction on identity, which incorporated the issues raised by Dr. Neuschatz's testimony. The proposed instruction read as follows:

One of the issues in this case is the identification of the defendant as the person who committed the crime. The State has the burden of [proving] identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness. It is a statement of how well the witness remembers the other person, and its value may depend upon your consideration of several factors including:

(1) The witness' capacity and opportunity to observe the other person. This includes, among other things, the length of time available for observation, the distance from which the witness observed, whether the two people are of the same race or different races, the lighting, whether a weapon was involved, the witness' level of stress or fear, whether the person was a prior acquaintance of the witness, and whether the witness was able to clearly see the person's face;

(2) The occasions, if any, on which the witness made either a correct or incorrect identification of the defendant and the circumstances surrounding that identification, including any actions on the part of the person conducting the lineup that might be suggestive or improperly bias the witness;

(3) The witness' prior descriptions, or lack thereof, of the person, including those given immediately after the event as well as those given at later times;

(4) Testimony regarding general principles of how memory works, if such is presented by either side.

Again, the State has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he is on trial. If after considering the identification testimony in light of all the proof you have a

- 8 -

reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

The trial court denied the Defendant's request, finding that the proposed jury instructions, if included, would amount to a comment on the evidence. Instead of providing the special instruction as requested, the trial court amended its instruction on the identification of the Defendant to allow the jury to consider "any other factors fairly raised by the evidence."

Following deliberations, the jury found the Defendant guilty of the lesser-included offense of second degree murder in count one, first degree felony murder in count two, and employing a firearm during the commission of a dangerous offense in count three. At a sentencing hearing, the trial court merged count one into count two and sentenced the Defendant to life for first degree felony murder. The trial court dismissed count three "as a matter of law."[2] The Defendant subsequently filed a timely motion for new trial, which was denied by the trial court after a hearing. This timely appeal followed.

## II. Analysis

### *Sufficiency of the Evidence*

The Defendant asserts that the evidence is insufficient to sustain his conviction for first degree felony murder because the identification testimony from Mr. Snorten and Mr. Simpson was unreliable. The Defendant argues that Mr. Snorten had a "substantial motivation to lie, rendering his testimony completely untrustworthy and incredible." He also contends that Mr. Simpson's initial description of the shooter did not correspond to the Defendant and that the trauma of the incident led to Mr. Simpson's incorrect identification of the Defendant in a photo lineup.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or

---

[2] Following the trial, the State requested that count three be dismissed as a matter of law based upon a faulty indictment.

- 9 -

circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Tennessee Code Annotated section 39-13-202(a)(2) states that "[a] killing of another committed in the perpetration of . . . robbery" is first degree murder. Tenn. Code Ann. § 39-13-202(a)(2) (2010). The felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)) (internal quotation marks omitted). "The killing may precede, coincide with, or follow the felony and still be considered as occurring in the perpetration of the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999) (internal quotation marks omitted). No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony—in this case, robbery. See Tenn. Code Ann. § 39-13-202(b) (2010). Robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010).

We conclude that, when viewed in the light most favorable to the State, the evidence clearly supports the Defendant's conviction for first degree felony murder. The proof at trial established that on the night of May 21, 2011, the Defendant, Mr. Sails, and Mr. Snorten planned to rob the victim, a known marijuana supplier. The three men armed themselves with guns and drove to the victim's residence. Once inside, the Defendant and Mr. Sails pulled out their guns and ordered the victim and Mr. Simpson to the floor. The Defendant told the victim and Mr. Simpson, "[D]on't do anything stupid, we'll shoot." The Defendant then took cash from the victim and Mr. Simpson. While

Mr. Snorten and Mr. Sails were in the back of the house dealing with Mr. Watson, the Defendant shot the victim in the back. Mr. Simpson testified that, immediately after the shooting, he looked at the Defendant and saw the Defendant standing over the victim with the gun. The Defendant, Mr. Sails, and Mr. Snorten then fled the scene. Inside the car, the Defendant took responsibility for the shooting telling Mr. Sails and Mr. Snorten, "[H]ey, man, my bad." Dr. Li testified that the victim died as a result of the gunshot wound to his back, and both Mr. Simpson and Mr. Snorten later identified the Defendant as the shooter.

The Defendant does not contest that the State presented sufficient evidence to establish the elements of the crime. Instead, he challenges the credibility of the State's two identification witnesses. However, the question of identity is a question of fact left to the jury to resolve. Crawford, 635 S.W.2d at 705. Moreover, the jury verdict accredits the testimony of the State's witnesses, and this court may not reweigh that evidence on appeal. Bland, 958 S.W.2d at 659. The Defendant is not entitled to relief.

### *Special Jury Instruction on Identity*

The Defendant argues that the trial court erred by denying his request for the special jury instruction modification on identity. He asserts that the trial court's instruction on identity failed to take into account "the objective nature of the scientific expert testimony offered by Dr. Neuschatz" and did not adequately inform the jury of the "current state of the law as it applied to the facts." The Defendant further asserts that the trial court's refusing to incorporate Dr. Neuschatz's factors into the jury instruction was the equivalent of the court "commenting that [the] evidence should be disregarded[.]" The State responds that because the trial court used the proper jury instruction on identity and amended its instruction to assure that the Defendant's evidence on identity could be considered, the jury received a "correct and complete" explanation of the current law as it applied to the case and there was no error. We agree with the State.

Questions regarding the propriety of jury instructions are mixed questions of law and fact; thus, our standard of review is de novo with no presumption of correctness. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). In Tennessee, "a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Additionally, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court need not grant a defendant's request for special instructions when the general jury charge is correct

and complete.  State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995) (citing State v. Blakely, 677 S.W.2d 12 (Tenn. Crim. App. 1983)).

In State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995), the Tennessee Supreme Court held that when identity is material and the instruction is requested by the defendant, the trial court must give the following instruction to the jury:

> One of the issues in this case is the identification of the defendant as the person who committed the crime.  The state has the burden of proving identity beyond a reasonable doubt.  Identification testimony is an expression of belief or impression by the witness, and its value may depend upon your consideration of several factors.  Some of the factors which you may consider are:
>
>> (1) The witness' capacity and opportunity to observe the offender.  This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;
>>
>> (2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;
>>
>> (3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and
>>
>> (4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.
>
> Again, the state has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he or she is on trial.  If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

Id.; see also 7 T.P.I.—Crim. 42.05 (18th ed. 2014). The Dyle Court adopted the above-quoted identity instruction over a more expansive instruction to avoid "impermissibly comment[ing] on the evidence; thus, invading the province of the jury." Dyle, 899 S.W.2d at 612.

In support of his position, the Defendant relies heavily on the Tennessee Supreme Court's decision in State v. Copeland, 226 S.W.3d 287 (Tenn. 2007). In Copeland, our supreme court overruled a per se ban on the admission of expert testimony on the reliability of eyewitness identification. Id. at 290, 300-01 (overruling State v. Coley, 32 S.W.3d 831 (Tenn. 2000)). However, the decision in Copeland was limited to ending the ban on expert testimony on identity based upon "advances in the field of eyewitness identification." Id. at 299. Copeland does not require the admission of the testimony of an eyewitness identification expert, nor does it require that a trial court adopt an expert's opinion testimony as "law" in its instruction to the jury. See id. at 299-301; Troy Allen Pruitt v. State, No. M2012-00897-CCA-R3-PC, 2013 WL 1858783, at *5 (Tenn. Crim. App. May 2, 2013), perm. app. denied, (Tenn. Sept. 10, 2013). To be in line with Copeland, all that a trial court is required to do is to allow the identification expert to testify. See Copeland, 226 S.W.3d at 299-302. The jury is still entrusted with determining the credibility of witnesses and the weight to be given their testimony and with reconciling conflicts in the proof. Rice, 184 S.W.3d at 662.

In this case, the trial court's charge to the jury on identity was complete and accurate. The instruction included the identification instruction as required by Dyle. The court also included an additional paragraph instructing the jury to consider "any other factors fairly raised by the evidence." The trial court's instruction was broad enough to allow the jury to consider the various factors affecting eyewitness identification discussed by Dr. Neuschatz in his testimony. The Defendant's proposed special jury instruction amending the Dyle instruction was not a correct statement of the law, and the trial court did not err in refusing to instruct the jury accordingly. We agree with the State that the identity instructive requested by the Defendant would have required the trial court to usurp the jury's role as finder of fact and direct it to accredit the testimony of the Defendant's expert witness. Because the jury received a "correct and complete" explanation of the current law as it applied to the case, the trial court's instruction was not error, and the Defendant is not entitled to relief.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE